UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                   Case Number 08-20517-BC
v.                                    Honorable Thomas L. Ludington

D-7 LUIS VIZCARRA,

       Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS PRODUCED FROM CUSTODIAL INTERROGATION

      On October 1, 2008, Defendant Luis Vizcarra was indicted on one count of conspiracy to manufacture marijuana. Defendant has six co-defendants who have also been indicted as part of the conspiracy. Now before the Court is Defendant's motion to suppress statements produced from custodial interrogation [Dkt. # 56]. The Court held a hearing on the motion on January 8, 2009, at which Defendant was present.

      As a result of the hearing and briefing submitted by the parties, the Court denied Defendant's motion to the extent that Defendant claimed that law enforcement did not have probable cause for his arrest after questioning him at the gas station, where they first encountered him. The Court also denied Defendant's motion to the extent that Defendant claimed that law enforcement did not advise Defendant of his *Miranda* rights before questioning him at the jailhouse and that Defendant's statements were coerced. However, the Court directed the parties to provide supplemental briefing on whether law enforcement was required to advise Defendant of his *Miranda* rights before, or during, the questioning of Defendant at the gas station. The Court is now able to conclude that

Defendant was not in custody for the purposes of *Miranda* prior to the point at which law enforcement read Defendant his *Miranda* rights. Thus, the Court will deny the remainder of Defendant's motion to suppress.

I

On September 17, 2008, police officers located a four-thousand plant marijuana grow operation within the Au Sable State Forest. At that time, numerous individuals were located at the operation; three individuals were apprehended and others fled on foot. The same day, three suspects were located nearby. A possible seventh suspect had also fled, but was not located by law enforcement that day.

After arresting the six suspects, police officers interviewed them. Four suspects were only able to converse in Spanish; Deputy Laura Rico, of the Gladwin County Sheriff's Department, assisted law enforcement during those interviews. During the interviews it was determined that all six suspects had been transported from the Detroit area to work at the grow operation. The police officers also determined that at least two of the six suspects had initially traveled to Detroit from Chicago.

On September 18, 2008, Deputy Carl Williams, of the Gladwin County Sheriff's Department, was on patrol in Gladwin County. Deputy Williams knew that a marijuana grow operation had been located nearby, that six of the suspects had been transported from the Detroit area to work the operation, and that some of those suspects were originally from Chicago. Deputy Williams testified that he had assisted in transporting two of the suspects. Deputy Williams also knew that a possible seventh suspect had fled the operation when law enforcement arrived. The suspect had been

described to Deputy Williams as a Hispanic male, approximately six-feet tall, wearing a camouflage shirt.

While on patrol, Deputy Williams responded to a "suspicious person" call at a gas station located within walking distance of the grow operation. When Deputy Williams, who was in uniform, arrived at the station, he met with the attendant, who stated that an individual had turned in a woman's purse. Deputy Williams testified that the attendant told him that the person who had turned in the person was standing outside the gas station and had been doing so for three to four hours.

Deputy Williams approached the individual and found him to be a Hispanic male, approximately six-feet tall, wearing a t-shirt over a long sleeve camouflage shirt. This individual was later identified as Defendant. Deputy Williams testified that he had difficulty speaking to Defendant due to Defendant's broken English, but that he did speak to him for four to five minutes. Deputy Williams testified that he asked Defendant about the purse and eventually Defendant stated that he was from Chicago and that he was waiting for his friends to pick him up from Detroit. Due to the language barrier, Deputy Williams decided that he needed to call Deputy Rico to the scene.

In order to await Deputy Rico's arrival, Deputy Williams asked Defendant to go with him to his car. Deputy Williams testified that he tried to explain to Defendant that he was not under arrest, but that he needed somebody to talk to him that could understand what he was saying. He asked Defendant if he could pat him down. He testified that he thought Defendant understood him and said yes. At that point, Deputy Williams patted him down and placed him in the backseat of his car. Deputy Williams testified that he placed his hand on Defendant's arm to escort him to the car. At the hearing, Deputy Williams confirmed that there are no handles on the interior of the door to

the backseat of the car and that if Defendant wanted to leave, he would have had to initiate some way of telling the Deputy that he wanted to leave. Deputy Williams testified, however, that the window was rolled down.

Deputy Williams testified that it took about five to ten minutes for Deputy Rico to arrive; she testified that it took her about six to eight minutes to arrive. She testified that she knew that there was a seventh suspect related to the marijuana grow operation. She also knew that he was a Hispanic male, about six-feet tall, wearing a camouflage shirt. Deputy Rico testified that when she arrived, Defendant was in the back seat of Deputy Williams' car with the door closed and window partially rolled down. She testified that when she arrived at the car, she introduced herself, asked Defendant his name, and opened the car door. She testified that she told him that he was not under arrest and advised him that she was there to figure out the situation with the purse. Deputy Rico testified that she did not recall whether Defendant placed his feet outside the car or turned his body towards the door to speak with her.

Initially, Defendant identified himself to Deputy Rico only as Luis and stated that he was going to a friend's house. Deputy Rico testified that when she asked where the house was located, Defendant pointed to the east, but was unable to provide a description. Deputy Rico testified that she asked Defendant if he wanted to tell the deputies the truth to figure out where he was going. Deputy Rico testified that Defendant pushed his head down, took a deep breath, gave his name as Luis Vizcarra, and said he had been at the ranch and that he had walked all night. Deputy Rico testified that she knew what he was talking about when Defendant referred to the ranch, but she asked him for clarification. Defendant then provided names of some of the people that Deputy Rico had arrested the night before in relation to the marijuana grow operation.

At that point, Deputy Rico asked Defendant if he could identify himself and he mentioned he had his identification in his wallet. She testified that she asked him to get out of the vehicles so that he could remove his identification from his wallet. Defendant did so and his identification provided the information of Defendant, Luis Vizcarra. Deputy Rico and Deputy Williams placed Defendant under arrest and transported him to the Gladwin County Jail. On cross-examination, Deputy Rico agreed that her conversation with Defendant was a "custodial interview," but not an "interrogation."

II

The question before the Court is whether Defendant was "in custody" for the purposes of *Miranda*, during or before Deputy Rico questioned Defendant at the gas station. Based on the facts developed at the hearing and the parties' motion papers, Defendant was not in custody before the Deputies placed Defendant under formal arrest, however, the question is a close one.

To determine whether a suspect is "in custody," "the ultimate inquiry is whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). In conducting this inquiry, the Sixth Circuit considers the totality of the circumstances to determine "how a reasonable man in the suspect's position would have understood the situation." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (quoting *United States v. Phillip*, 948 F.2d 241, 247 (6th Cir. 1991)). "[T]he test for *Miranda* purposes is not simply whether a reasonable person would have felt free to leave in the circumstances surrounding the interrogation." *Id.* Rather, whether a reasonable person in the suspect's position would have felt free to leave is one of many factors to consider, including:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Id.* at 950.

In contending that the deputies questioning of him was custodial, Defendant highlights the following facts: Deputies Williams and Rico knew about the marijuana grow operation and suspected Defendant of being the seventh suspect at the time that they questioned him at the gas station. Deputy Williams admitted in his testimony that he placed his arm on Defendant while escorting him to the police car. Defendant could not have exited the police car of his own volition because there were no handles on the inside of the car door. Defendant had no way to leave the scene as he was waiting for a ride back to Chicago. Defendant spoke only broken English, and knew that the police were accusing him of a crime.

In contrast, the government emphasizes that the fact that Defendant was temporarily detained in the back of the police car does not automatically make the situation custodial, citing *Salvo*, 133 F.3d at 951 (finding the suspect was not in custody even though some questioning took place in a police car) and *United States v. Wright*, No. 06-5164, 2007 WL 1028863 (6th Cir. Apr. 3, 2007) (same). Rather, the fact that Defendant was temporarily detained in the back of the police car is one factor considered in the totality of the circumstances analysis.

The government emphasizes that the purpose of Defendant's detention was to investigate both the recovery of the purse and the marijuana grow operation, or to "quickly confirm or dispel the officer's suspicion of criminal activity," *Wright*, 2007 WL 1028863, at *3, rather than to obtain

a confession. The government further emphasizes that Defendant was detained for the purpose of allowing the Spanish-speaking deputy time to arrive, and that Defendant was only detained for approximately thirty minutes and questioned for only twenty minutes.

The government highlights that the location of the questioning was a commercial business, a public location that was neither hostile nor coercive. *See Berkemer v. McCarty*, 468 U.S. 420, 438 (noting that, in the context of a traffic stop, "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse"). The deputies never told Defendant that he could not leave nor that he was required to answer questions. Defendant was not handcuffed or otherwise restrained in the patrol car. Additionally, Defendant had voluntarily spoke to the deputies before and after he was seated in the patrol car.

Defendant contends that *Salvo* and *Wright* are distinguishable from this case. In *Salvo*, Defendant emphasizes that the court did not find the Burger King parking lot to be coercive because the defendant chose the location of the interview, the officer chose the police car because of the privacy it afforded the defendant when he was suspected of having child pornography on his computer, and the defendant had complete freedom of movement. In *Wright*, Defendant emphasizes that the officer involved in that case did not have any advance information about the defendant and was simply attempting to confirm or dispel suspicions that had arisen on the scene.

Defendant contends that this case is different because "questioning done in the back of the police car of a Mexican citizen who barely speaks English is inherently coercive," Defendant was questioned by two officers, the police car doors were closed when Defendant was first placed in the back of the police car, and Defendant did not initiate contact with the police.

As Defendant suggests, there are several facts which suggest that the deputies' questioning of Defendant may have been "custodial." Deputy Williams led Defendant to the police car, the door was closed for part of the questioning, the window was only partially down, Defendant was only able to speak broken English, and Defendant could not leave the gas station because he was waiting for a ride from his friends. However, Defendant's contention that these facts make the questioning "inherently coercive" is not enough to make the situation "custodial." *See Knox*, 839 F.2d at 291 (stating that "more is required to support a finding of custody than the fact that the questioning took place in an 'inherently' coercive environment"). As the U.S. Supreme Court has stated:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.

*Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

Given that Defendant has conceded that Deputy Williams had "reasonable cause" (sic) to detain Defendant at the gas station, the circumstances here did not elevate from an investigatory detention to a "custody" situation. Based on the parties description of the events, the gas station appears to have been isolated, with the police car being one of the only places Deputy Williams could have detained Defendant while awaiting the arrival of Deputy Rico. Although Deputy Williams led Defendant to the police car by touching his arm, he also told Defendant that he was not under arrest. The deputies did not choose the gas station as the location to interview Defendant in order to intimidate Defendant; rather, he arrived at the gas station on his own. The fact that practically, and subjectively, Defendant did not have anywhere else to go because he was waiting for a ride, is not strong evidence supporting the proposition that his freedom of movement was

restrained by the officers or that he was not in fact free to leave. Most significantly, however, is the fact that both deputies, including the Spanish-speaking deputy, Deputy Rico, informed Defendant that he was not under arrest. While Deputy Williams statement to Defendant that he was not under arrest may not have been enough, as it is unclear how well Defendant understood English, Deputy Rico's statement in Spanish persuades the Court that Defendant was not "in custody" for the purposes of *Miranda*.

Accordingly, it is **ORDERED** that Defendant's motion to suppress statements produced from custodial interrogation [Dkt. # 56] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 5, 2009

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 5, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS